# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

TANA R. MIVILLE,                           )
                                           )
                                           )
              Plaintiff,                   )
                                           )
v.                                         )          No.  04-CV-536-SAJ
                                           )
JO ANNE B. BARNHART,                       )
Commissioner of Social Security            )
Administration,                            )
                                           )
              Defendant.                   )

### OPINION AND ORDER[1]

Pursuant to 42 U.S.C. § 405(g), Plaintiff appeals the decision of the Commissioner denying Social Security benefits.[2] Plaintiff asserts only two limited errors.  Plaintiff requests reversal because (1) the ALJ erred in finding that Plaintiff had the RFC to perform sedentary work, and because (2) the ALJ failed to properly consider the opinion of one of Plaintiff's "treating sources."  Plaintiff raises no other errors.  For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision for further proceedings consistent with this opinion.

---

[1]   This Order is entered in accordance with 28 U.S.C. § 636(c) and pursuant to the parties' Consent to Proceed Before United States Magistrate Judge.

[2]   Administrative Law Judge Lantz McClain (hereafter "ALJ") concluded that Plaintiff was not disabled by decision dated December  22, 2003.  [R. at 11-21].  Plaintiff appealed the decision by the ALJ to the Appeals Council.  The Appeals Council declined Plaintiff's request for review on April 29, 2004.  [R. at 5].

## I. FACTUAL AND PROCEDURAL HISTORY

In her application for supplemental security income, Plaintiff indicated her date of birth was January 15, 1957. [R. at 48]. Plaintiff asserts she became disabled on June 28, 2002. [R. at 48].

Plaintiff's mother completed a form on Plaintiff's behalf on January 28, 2002. [R. at 78]. She noted that she had observed Plaintiff having seizures. The last seizure observed by Plaintiff's mother was on January 27, 2002. Plaintiff's mother wrote that Plaintiff begins to have headaches and then Plaintiff collapses. [R. at 78]. Plaintiff is not conscious during an episode. [R. at 78]. Plaintiff's coloring changes to gray. [R. at 78]. Plaintiff's mother noted Plaintiff has tremors and then "goes into a grand mal seizure" which lasts from one to two hours. [R. at 78].

Plaintiff completed a daily routine form on December 30, 2002. [R. at 79]. Plaintiff noted that she eats breakfast, dresses herself, and puts on her leg brace. [R. at 79]. According to Plaintiff, dressing "takes most of the morning." In the afternoon Plaintiff walks several blocks and then rests. [R. at 79]. Plaintiff sleeps approximately six hours each night. According to Plaintiff, her seizures are more frequent at night. [R. at 79]. Plaintiff wrote that she needed assistance showering because she could have seizures. [R. at 80]. Plaintiff's mother cooks. Plaintiff indicated that she keeps her room clean, puts dishes in the dishwasher, and folds clothes. [R. at 81]. Plaintiff shops for groceries twice each week and it takes her several hours. [R. at 81]. Plaintiff noted that she was unable to read because it leads to her seizures. [R. at 82]. Plaintiff does watch football and movies on television. [R. at 82]. Plaintiff paints each day. [R. at 82]. Plaintiff visits friends with the assistance of others, each week, for four to five hours. [R. at 83].

On January 23, 2003, Plaintiff informed a disability examiner that she suffered from seizures almost daily.  [R. at 86].

On her medications list, Plaintiff noted she took Tylenol for pain, Ativan for anxiety, Neurontin for seizures, Lexapro for depression, Dilantin for seizures, Lisipnopril for high blood pressure, and phenobarbital for seizures.  [R. at 98].

Plaintiff was treated in the emergency room on January 2, 2002.  Plaintiff was a passenger in a motor vehicle accident in which the vehicle overturned.  [R. at 102].  X-rays of Plaintiff's thoracic spine were unremarkable.  [R. at 103].

A CT scan of the lumbar spine was interpreted as showing marked bulging of the annulus at L5-S1 centrally and on the left side.  No fracture was identified.  Mild bulging was noted at L4-L5.  [R. at 138].

On May 30, 2002, Plaintiff was treated for intractable, inoperable back pain.  Plaintiff is 5'11" and 130 pounds.  [R. at 204].  Plaintiff was prescribed painkillers and signed an opiod agreement.  [R. at 209].

Plaintiff was admitted June 28, 2002 and discharged July 12, 2002.  [R. at 108].  Plaintiff received injuries in a motor vehicle collision and had surgery on her left hip.  Hospital reports note that Plaintiff was the restrained driver and required extrication at the scene.  Plaintiff's vehicle rolled and came to a stop upside down.  [R. at 110].  Plaintiff complained of severe pain in her left hip and right shoulder.

While in the hospital following the car accident, Plaintiff suffered what was probably a seizure and could have been "benzo" withdrawal.  [R. at 117].  Plaintiff's doctor noted that Plaintiff must follow seizure precautions and that even if Plaintiff recovered, Plaintiff should not drive for at least six months.

-- 3 --

Plaintiff was examined July 7, 2002.  [R. at 119].  The examining doctor noted Plaintiff had chronic back pain of unclear etiology.  [R. at 119].  Plaintiff had surgery and was later transferred to intensive care due to complications.  [R. at 120].

Plaintiff had an EMG and nerve conduction study report on November 6, 2002.  The study was interpreted as indicating evidence to suggest a right-sided peroneal neuropathy with compression at or near the region of the fibular head.  No evidence of lumbar radiculopathy was noted.  [R. at 144].

On October 17, 2002, Plaintiff noted she was very depressed.  Her husband had died the previous week.  [R. at 148].  The doctor recommended an EMG nerve conduction study.  [R. at 148].  Plaintiff was prescribed a quad cane.  [R. at 148].

On November 14, 2002, Plaintiff was five months postop and described as doing very well.  [R. at 147].  Plaintiff reported some stiffness in her neck.  [R. at 147].  Plaintiff reported a foot drop.  The doctor noted that the EMG nerve conduction study indicated some evidence of lack of voluntary effort.  Plaintiff ambulated with a steppage gait.  Plaintiff was encouraged to ambulate more normally.  [R. at 147].  Plaintiff was encouraged to continue walking daily for  exercise.  [R. at 147].

In a pain questionnaire completed December 6, 2002, Plaintiff noted that walking alleviated her pain, and that she was able to walk for six blocks before having to stop.  [R. at 177].  Plaintiff also noted that sitting relieved her pain and that she was able to sit for thirty minutes in one position.  [R. at 177].

Plaintiff was examined by Sidney Williams, M.D., on January 8, 2003, for a determination of whether her complaint of some stolen medication was acceptable.  [R. at 157].  Plaintiff complained of pain in the lumbar spine with radiation to her right leg.  [R. at

157].  The doctor concluded that Plaintiff should be continued on Oxycontin, Lorazepam, and Neruontin.  [R. at 157].

Plaintiff reported a seizure on December 5, 2002.  [R. at 222].  Plaintiff had a significant foot drop.  Plaintiff had bruising on her left shoulder when she fell after a reported seizure.  [R. at 222].  The doctor noted Plaintiff's history of grand mal epilepsy, not controlled.  [R. at 222].

On January 14, 2003, Plaintiff's doctor noted that he increased her seizure medicine to four times each day because Plaintiff reported that she was still having one seizure each day that was very light.  [R. at 218].  Plaintiff reported continued pain in her left lower extremity with weakness from the motor vehicle accident.  [R. at 218].

A Physical Residual Functional Capacity form was completed by Thurma Fiegel on February 25, 2003.  [R. at 236].  Plaintiff could occasionally lift ten pounds, frequently lift less than ten pounds, stand at least two hours in an eight hour day, and sit about six hours in an eight hour day.  [R. at 230].

On April 29, 2003, David A. Traub, M.D., reported that injections had helped Plaintiff's pain and that her "traps" felt better but that Plaintiff still reported a lot of neck pain. [R. at 251].  On April 15, 2003, Plaintiff was given a suprascapular nerve block based upon pain in her neck and back.  [R. at 253].  A May 16, 2003 blood work-up indicated Plaintiff's dilantin levels were 9 with a reference range of 10 - 20.  [R. at 277].

Plaintiff's doctor renewed a Tylenol 3 prescription for Plaintiff on July 22, 2003.  He noted that x-rays on July 23, 2003 indicated Plaintiff's shoulder was doing better and that she had improved her range of motion.  [R. at 262].  The doctor encouraged her to perform "pendulum exercises" to wean herself off of the shoulder sling.  [R. at 262].

-- 5 --

On July 15, 2003, Plaintiff reported that she was assaulted and that her medications were stolen.  [R. at 269].  Plaintiff requested a medicine refill.  [R. at 270].

A Physical Medical Source Statement completed by Claude H. Denize, PA-C on September 29, 2003, indicated Plaintiff could occasionally lift five pounds.  [R. at 281].  The doctor noted Plaintiff could sit 20 minutes at a time, stand 15 minutes at a time, and walk 30 minutes at a time.  [R. at 279].  Plaintiff could sit, stand, and walk those same amounts during an entire eight hour day.  [R. at 279].

Plaintiff testified at a hearing before the ALJ on October 1, 2003.  [R. at 230].  Plaintiff was born January 15, 1957, and was 46 years old at the time of her hearing before the ALJ.  [R. at 295].

Plaintiff testified that although she had a valid Oklahoma license, she was not currently driving due to her seizure disorder.  [R. at 296].

Plaintiff completed high school and obtained her nursing degree in California.  [R. at 296].  Plaintiff noted that the nursing degree is a four year degree program.  [R. at 297].  Plaintiff's nursing certification expired in 2001.  [R. at 297].

According to Plaintiff, she still experiences seizures.  Plaintiff testified that her seizures make her sick to her stomach, cause blurred vision and headaches, and that Plaintiff must lay down on the floor.  [R. at 298].  Plaintiff stated that on average she experiences about four seizures each week which last from thirty minutes to one hour and one-half.  [R. at 299].  Plaintiff testified that she has suffered from seizures since 2002.  [R. at 299].  According to Plaintiff, her seizures are currently worse than they were when she first began to experience seizures.  [R. at 300].

Plaintiff stated that her seizures were not currently controlled by Dilantin.  Plaintiff noted that her Dilantin had been increased and she had been placed on Phenobarbital, but that her seizures had not ceased.  Plaintiff had no seizure history prior to June 2002, and Plaintiff does not know what started or caused her seizures.  [R. at 300].

Plaintiff was in a car accident in the summer of 2002.  Plaintiff broke her neck in the car accident.  Plaintiff stated that surgery was not an option because the break was too close to her spinal cord.  Plaintiff had rehabilitation for one month.  [R. at 301].  Plaintiff stated that she had continued to have problems with her neck.  [R. at 301].  Plaintiff cannot turn completely around, and when Plaintiff bends it hurts and pain radiates down her arms.  [R. at 302].  Plaintiff experiences this pain daily.  [R. at 303].  On an average day, Plaintiff's neck constantly aches.  On some days the pain is excruciating.  [R. at 303].  On really bad days, Plaintiff must lie down because of the pain.  [R. at 304].

Plaintiff experiences headaches daily.  Usually the headaches are dull, but sometimes they are so severe Plaintiff must lay down.  [R. at 304].  Plaintiff stated that her headaches are particularly bad two or three times each week.  [R. at 304].

Plaintiff had a hip replacement with rods, pins and screws as a result of the car accident. [R. at 306].  Plaintiff experiences discomfort when she is walking, and sometimes her hip area simply hurts.  [R. at 306].  Plaintiff experiences pain on a daily basis.  Sometimes the pain is so bad that she cannot feel her leg.

Plaintiff testified that she has "drop foot" and cannot carry her foot in a normal way, but that her ankle turns in so when she walks she had to pick up her entire leg because she cannot feel her leg from the knee down.  [R. at 308].  Plaintiff walks with the assistance of

a leg brace.  [R. at 309].  Plaintiff used a walker from June 2002 until January 2003.  [R. at 309].

Plaintiff also stated that she has pain in her lower back.  [R. at 310].  Plaintiff broke her back, pelvis, and injured her lower back in June 2002.  [R. at 310].  Plaintiff's lower back and pelvis hurt every day.  [R. at 310].  Plaintiff experiences severe pain about every other day, and a dull aching pain about every day.  [R. at 311].

According to Plaintiff, she has experienced vision problems since she had the seizures.  [R. at 311].  Plaintiff's vision problems are worse after a seizure for about two to three hours following the seizure.  [R. at 312].

Plaintiff also believes that she is currently suicidal.  [R. at 312].  Plaintiff has also lost weight over the past year.  Plaintiff states that she is simply not hungry.  [R. at 313].  Plaintiff testified that she experiences panic and anxiety attacks on a daily basis.  [R. at 313].

Plaintiff believes she could stand for approximately 20 minutes before she would become too weak to stand.  Plaintiff can walk less than one full block before her legs give out.  [R. at 315].  Plaintiff's gait is problematic because of her drop foot problem.  [R. at 316].  Plaintiff does not believe that she has the strength to lift five pounds.  [R. at 318].  Plaintiff continues to experience numbness in her hands due to her neck pain.  [R. at 318].

Plaintiff believes that she last drove in June 2003, and that the doctors have told her not to drive.  [R. at 322].  Plaintiff stated that she is a restless sleeper, and frequently goes to bed at 9:00, and wakens at 3:30 a.m.  [R. at 323].  Plaintiff noted that to ease the pain she has to lie flat.  [R. at 323].  Plaintiff stated that she has a friend who assists her with her

housework.  [R. at 326].  Plaintiff's friend does her laundry.  [R. at 327].  Plaintiff has to rest

when unloading the dishwasher.  [R. at 327].

## II. SOCIAL SECURITY LAW AND STANDARD OF REVIEW

The Commissioner has established a five-step process for the evaluation of social

security claims.  *See* 20 C.F.R. § 404.1520.  Disability under the Social Security Act is

defined as the

> inability to engage in any substantial gainful activity by reason
> of any medically determinable physical or mental impairment
> . . . .

42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Social Security Act only if his

> physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work in the
> national economy. . . .

42 U.S.C. § 423(d)(2)(A).[3/]

The Commissioner's disability determinations are reviewed to determine (1) if the

correct legal principles have been followed, and (2) if the decision is supported by

---

[3/]   Step One requires the claimant to establish that he is not engaged in substantial gainful activity (as defined at 20 C.F.R. §§ 404.1510 and 404.1572).  Step Two requires that the claimant demonstrate that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 1521.  If claimant is engaged in substantial gainful activity (Step One) or if claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, claimant's impairment is compared with those impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings").  If a claimant's impairment is equal or medically equivalent to an impairment in the Listings, claimant is presumed disabled.  If a Listing is not met, the evaluation proceeds to Step Four, where the claimant must establish that his impairment or the combination of impairments prevents him from performing his past relevant work.  A claimant is not disabled if the claimant can perform his past work.  If a claimant is unable to perform his previous work, the Commissioner has the burden of proof (Step Five) to establish that the claimant, in light of his age, education, and work history, has the residual functional capacity ("RFC") to perform an alternative work activity in the national economy.  If a claimant has the RFC to perform an alternate work activity, disability benefits are denied.  *See* <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987); <u>Williams v. Bowen</u>, 844 F.2d 748, 750-51 (10th Cir. 1988).

substantial evidence.  *See* 42 U.S.C. § 405(g); *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

The Court, in determining whether the decision of the Commissioner is supported by substantial evidence, does not examine the issues *de novo*.  *Sisco v. United States Dept. of Health and Human Services*, 10 F.3d 739, 741 (10th Cir. 1993).  The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner.  *Qualls v. Apfel*, 206 F.3d 1368 (10th Cir. 2000); *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  The Court will, however, meticulously examine the entire record to determine if the Commissioner's determination is rational.  *Williams*, 844 F.2d at 750; *Holloway v. Heckler*, 607 F. Supp. 71, 72 (D. Kan. 1985).

"The finding of the Secretary[4/] as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §  405(g).  Substantial evidence is that amount and type of evidence that a reasonable mind will accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Williams*, 844 F.2d at 750.  In terms of traditional burdens of proof, substantial evidence is more than a scintilla, but less than a preponderance.  *Perales*, 402 U.S. at 401.  Evidence is not substantial if it is overwhelmed by other evidence in the record.  *Williams*, 844 F.2d at 750.

This Court must also determine whether the Commissioner applied the correct legal standards.  *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).    The

---

[4/]    Effective March 31, 1995, the functions of the Secretary of Health and Human Services ("Secretary") in social security cases were transferred to the Commissioner of Social Security. P.L. No. 103-296.  For the purpose of this Order, references in case law to "the Secretary" are interchangeable with "the Commissioner."

Commissioner's decision will be reversed when he uses the wrong legal standard or fails to clearly demonstrate reliance on the correct legal standards.  *Glass*, 43 F.3d at 1395.

## III.  ADMINISTRATIVE LAW JUDGE'S DECISION

The ALJ discounted the testimony of Plaintiff and the opinion of the Physicians Assistant.  The ALJ concluded that Plaintiff could lift or carry ten pounds occasionally, and five to ten pounds frequently, and stand or walk for two hours in an eight hour day, or sit for six hours in an eight hour day.  [R. at 19].  Plaintiff was to avoid hazards and take seizure precautions.  Based on the testimony of a vocational expert, the ALJ found that Plaintiff could perform several unskilled sedentary jobs in the regional and national economies.

## IV.  REVIEW

### RFC TO PERFORM SEDENTARY WORK

Plaintiff labels Plaintiff's first issue as an alleged error by the ALJ in concluding that Plaintiff had the RFC to perform sedentary work.  "RFC" or residual functional capacity is "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirement of jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(c).  Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(b).

Plaintiff's alleged error is, at best confusing, and exhibits a misconception of social security law.  First, Plaintiff notes that the ALJ must relate all the limitations that the ALJ finds Plaintiff has in a precise question to the vocational expert for the testimony of the vocational expert to support the ALJ's findings.  Second, Plaintiff noted that the definition of a "full range" of sedentary work.  Plaintiff then notes that, pursuant to the definition of a full range of sedentary work, the DOT defines "occasionally" as equating to up to one-third of the time.  Plaintiff therefore concludes that a sedentary job requires, at a minimum, that Plaintiff be able to walk for up to one-third of an eight hour day.  However, the ALJ did not present the "full range of sedentary work" to the vocational expert.  The ALJ modified that, and limited Plaintiff to no more than standing or walking for two hours, maximum, in an eight hour day.  Plaintiff's assertions that the limitations imposed by the ALJ equate to one-third of an eight hour day are incorrect.  *See Talley v. Sullivan*, 908 F.2d 585, 588 (10th Cir. 1990) (an ALJ is not required to accept all of a plaintiff's testimony with respect to restrictions as true, but may pose such restrictions to the vocational expert which are accepted as true by the ALJ); *Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995) (an ALJ need include only those limitations in the question to the vocational expert which he properly finds are established by the evidence).

Plaintiff additionally asserts, within the section that Plaintiff labels as the ALJ's error in determining Plaintiff's RFC, that the medical evidence indicates that Plaintiff cannot stand or sit for more than 15 to 20 minutes at one time, and that Plaintiff suffers from four seizures each week.  Plaintiff relies primarily on her own testimony and additionally refers to a form completed by a Physician's Assistant and those supporting medical documents.  The ALJ discussed, to a limited degree, Plaintiff's testimony, noting that Plaintiff's

complaints appeared exaggerated compared to Plaintiff's own assertions as to her daily activities.  The ALJ also noted that Plaintiff's seizure disorder had minimal documentation in the medical record and that at least one doctor had questioned Plaintiff's medical compliance.

Plaintiff also asserts that Plaintiff testified that she suffers from multiple impairments including back pain and resulting injuries from a car accident.  Plaintiff noted a subsequent fall and treatment for neck pain, including injections.   Plaintiff's medical record includes EMG nerve conduction studies that indicated a right-sided peroneal neuropahty.  Plaintiff's records indicate she required, at one time a quad cane.  Numerous doctors discuss Plaintiff's "drop foot" difficulty.

The Court has reviewed the medical record and the conclusions by the ALJ with regard to Plaintiff's RFC.  The Court concludes that the RFC is not supported by substantial evidence.  The ALJ does not thoroughly address Plaintiff's drop foot.  Plaintiff's records substantiate some complaints regarding her seizure disorder, some back problems, neck problems, and narcotic prescriptions for pain.  No examining or treating doctor indicated Plaintiff's capabilities.  The Court concludes that the ALJ's findings with regard to Plaintiff's RFC are not supported by substantial evidence.

### CONSIDERATION OF TREATING SOURCE

Plaintiff additionally asserts that the ALJ committed error by not properly considering, as a treating source, the opinion of Claude H. Denize, a physician's assistant.

Initially, Plaintiff does not explain how a physician's assistant qualifies as a treating physician.  The regulations define a medical opinion as from a physician, psychologist or "other acceptable medical source."   Plaintiff has not established in what manner a

physician's assistant qualifies as an acceptable medical source. *See e.g. St Clair v. Apfel*, 215 F.3d 1337, 2000 WL 663958 at *3 (10th Cir. 2006) ("The regulations further define the term "acceptable medical sources" to include "(1) Licensed physicians; (2) Licensed osteopaths; (3) Licensed or certified psychologists; (4) Licensed optometrists ...; and (5) Persons authorized to send [the agency] a copy or summary of the medical records of a hospital, clinic, sanatorium, medical institution, or health care facility." [20 C.F.R.] § 404.1513(a)."). Plaintiff does assert that she was unable to see a medical doctor at the Indian treating facility. However, the record includes numerous other doctors that treated Plaintiff and no explanation is given as to why any of those doctors, some of whom encouraged Plaintiff to walk, did not complete a residual functional capacity assessment form.

The ALJ did discuss Denize's opinion. The ALJ noted that Denize's limitations, which were the same for an eight hour day as for one period of time seemed unsupported by the medical record and contradicted by Plaintiff's own account of her daily activities.

This action is reversed and remanded for further proceedings consistent with this opinion.

Dated this 29th day of March 2006.

Sam A. Joyner
United States Magistrate Judge